Ashley V. Cheff (AZ #036065)
**STINSON LLP**
1850 North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
Tel: (602) 279-1600
Fax: (602) 240-6925
Email: ashley.cheff@stinson.com

Patrick. A. Edwards (*Pro Hac Vice* forthcoming)
Daniel J.E. Sparacino (*Pro Hac Vice* forthcoming)
1625 N. Waterfront Pkwy, suite 300
Wichita, Kansas 67206-6620
Tel: (316) 268-7917
Fax: (316) 265-1349
Email: patrick.edwards@stinson.com
Email: daniel.sparacino@stinson.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| SBA Communications Corporation, a Delaware corporation, and SBA Towers X, LLC, a Delaware limited liability company,<br><br>      Plaintiffs,<br><br>v.<br><br>Navajo County, Arizona, and The Navajo County Board of Supervisors.<br><br>      Defendants. | No.<br><br>**COMPLAINT** |

## <u>COMPLAINT SEEKING EQUITABLE AND MANDAMUS</u>

## <u>RELIEF AND REQUEST FOR EXPEDITED REVIEW</u>

COME NOW Plaintiffs SBA Communications Corporation and SBA Towers X, LLC (collectively "SBA" or "Plaintiffs") by and through its attorneys, and for their Complaint against Defendants Navajo County, Arizona and the Navajo County Board of Supervisors (collectively the "County" or "Defendants") state and allege as follows:

## NATURE OF THE ACTION

1. This action seeks relief from the Defendants' illegal denial of SBA's application ("Application") for a special use permit ("SUP") to construct a 120-foot multi-carrier monopole telecommunication tower and associated facilities (the "Proposed Tower") on a parcel of property east of Snowflake, Arizona and just north of East Concho Highway.

2. The Proposed Tower location is a 51.16-acre parcel located Northeast of the intersection of East Concho Highway and White Antelope Road and is currently used for cattle grazing by Willis Ranch LLC.

3. The Proposed Tower location is a location currently zoned for Commercial-Residential (C-R), and the construction and operation of the Proposed Tower is a permitted special use under the County zoning code.

4. Plaintiffs seek to build the Proposed Tower so that Verizon Wireless ("Verizon") as well as other mobile carriers can provide adequate cellular service coverage and capacity to the citizens of the County as well as travelers along East Concho Highway, a major thoroughfare.

5. Defendants' denial of Plaintiffs' Application to construct the Proposed Tower violates the "Federal Telecommunications Act of 1996" (the "TCA"; 47 U.S.C. § 332, *et seq.*) because Defendants denied the Application based on concerns regarding the effect of radio frequency ("RF") emissions on certain residents, their community, and the environment.

6. Defendants' denial further violates the TCA because the denial is not based on substantial evidence in the record.

7. Defendants' denial also violates the TCA because the denial effectively prohibits cellular service in the area.

8. Plaintiffs seek declaratory, injunctive, and mandamus relief pursuant to 47 U.S.C. § 332 and 28 U.S.C. § 2201, requesting that Defendants be ordered to approve the Application or that the Application be deemed approved.

CORE/3524207.0005/194477210.5

**PARTIES**

9.    SBA Communications Corporation is, and at all times relevant hereto has been, a Delaware for profit corporation registered to conduct and conducting business in the state of Arizona.

10.    SBA Towers X, LLC is, and at all times relevant hereto has been, a Delaware limited liability company registered to conduct and conducting business in the state of Arizona.

11.    Navajo County, Arizona Board of Supervisors ("Board") constitutes the governing body of the County.

12.    The County acts through the Board.

13.    The County is organized under the laws of the State of Arizona and has the capacity to sue and be sued.

**JURISDICTION AND VENUE**

14.    This Court has subject matter jurisdiction over Counts I-III pursuant to 28 U.S.C. § 1331 because these claims arise under the laws of the United States, specifically 47 U.S.C. § 332(c)(7). This Court has subject matter jurisdiction over Count IV pursuant to 28 U.S.C. § 1331 because this claim arises under the laws of the United States, specifically 28 U.S.C. § 2201.

15.    This case presents an actual controversy under Article III of the United States Constitution and 28 U.S.C. § 2201 because the County has violated Plaintiffs' federal rights under the TCA.

16.    Venue is proper in this Court because the County is in this judicial district, the events and/or omissions giving rise to this action occurred in this judicial district, and the property affected is located within this judicial district.

17.    The TCA provides that "the Court shall hear and decide such action on an expedited basis." 47 U.S.C. § 332(c)(7).

## FACTS

### I.   FEDERAL CONTROL OVER THE CONSTRUCTION OF WIRELESS FACILITIES

18.    The demand for increased coverage and capacity of wireless service and the rapid transmission of wireless data has never been higher.

19.    Section 151 of the TCA establishes a national policy to "make available, so far as possible to all people of the United States, without discrimination . . . a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of national defense, [and] for the purpose of promoting safety of life and property through the use of wire and radio communications . . . ." 47 U.S.C. § 151.

20.    Section 1302(a) of the TCA provides that, "[t]he [Federal Communication Commission] and each State commission with regulatory jurisdiction over telecommunications services shall encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans . . . by utilizing, in a manner consistent with the public interest, convenience and necessity . . . regulating methods that remove barriers to infrastructure investment." 47 U.S.C. § 1302(a).

21.    Consistent with these policies, Congress and the FCC have sought to eliminate barriers and streamline the regulatory review process to facilitate deployment of wireless communications infrastructure, including the construction of wireless communications facilities ("WCFs"), necessary for the efficient creation of new wireless networks.

22.    Section 332(c)(7) of the TCA generally preserves State and local authority over wireless facility siting and construction, while also placing important limitations on that authority.

23.    Section 332(c)(7)(B)(iv) states: "No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions."

24.    Section 332(c)(7)(B)(iii) requires that "[a]ny decision by a state or local

government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record."

25.    Furthermore, the TCA prohibits local regulation of the placement, construction, or modification of personal wireless service facilities that "prohibit[s] or ha[s] the effect of prohibiting the provision of personal wireless services." 47 U.S.C. 332(c)(7)(B)(i)(II).

26.    In addition to these limitations on local regulatory authority, the TCA also provides that "[a]ny person adversely affected by any final action or failure to act" by a State or local government on a personal wireless service facility siting application "may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction." 47 U.S.C. § 332(c)(7)(B)(v).

## II.    THE COUNTY'S ZONING REGULATIONS

27.    The County sets forth relevant portions of its zoning regulations (the "County Regulations") on its website, attached hereto as **Exhibit 1**.

28.    The County Regulations create thirteen (13) zoning districts, including C-R districts. The Proposed Tower site was in a C-R district. **Ex. 1 p. 15-5 ,15-7; Ex. 2 p. 2**.

29.    The County Regulations provide that WCFs are allowed as "special use" on land zoned C-R: "A building or premises shall be used only for the following purposes: . . . 65. Radio and television broadcasting stations and studios, but not including transmitter towers and stations." **Ex. 1 pp. 15-5, 15-8**. However, Article 20, Section 2001 of the County Regulations provides: "The Board of Supervisors may permit as a Special Use the following uses in zoning districts from which they are otherwise prohibited by this Ordinance . . . 34. Television, wireless towers, and radio transmitter towers and stations. . . ." **Ex. 1 pp. 20-1, 20-3**.

30.    Article 20 of the County Regulations govern all SUP applications. **Ex. 1 pp. 20-1, 20-3**.

31.    Generally, an SUP application is submitted to the Director of the Planning and

5

Zoning Commission (the "Commission"), and it must include the applicable fee, plans, and supporting statement. **Ex. 1 p. 20-3**.

32. The Commission will then make a recommendation to the Board which in turn holds a public hearing before either approving or denying the SUP application. **Ex. 1 p. 20-4**.

33. In addition to these general provisions, Section 2521 regulates WCF's and WCF SUP applications. **Ex. 1 p. 25-22**.

34. Section 2521 states its goal is "to provide for the development of wireless communications services County-wide by: (1) Considering the public health, safety, and welfare; (2) Considering the impact on adjacent properties; (3) Encouraging configuration which minimizes additional visual impact through proper siting, design, landscape, and camouflage techniques; (4) Considering historical and environmentally sensitive areas. 5. Encouraging the collocation of facilities." **Ex. 1 p. 25-22**.

35. Section 2521 also provides additional application requirements and procedures, including among other requirements the addition of visual simulations, additional meetings with members of the public who reside particularly close to the proposed site, an engineering analysis, and evidence eliminating alternative sites within five (5) miles of the proposed site. **Ex. 1 p. 25-27 – 25-29**.

36. When considering a WCF SUP application, the County is to consider "height proposed, proximity to other uses, historic sites, landmarks, vehicle traffic routes, medical facilities, air routes, topographical features, utilities, access, suitability of alternative sites and visual impact." **Ex. 1 p. 25-28**.

**III.    SBA'S APPLICATION FOR SPECIAL USE PERMIT**

37. SBA is in the wireless telecommunications industry and places, constructs, modifies, operates, and manages personal wireless services and telecommunication facilities on behalf of its clients across the United States.

38. One of SBA's clients is Verizon, a national provider of personal wireless

CORE/3524207.0005/194477210.5

communication service, which holds one or more licenses granted by the FCC to provide commercial radio services, or wireless telecommunication services, across the United States.

39.  To provide effective, continuous, and uninterrupted wireless communications service, cellular service providers, such as Verizon, rely upon a network of overlapping and interconnected personal wireless service facilities. These personal wireless service facilities receive and transmit low-power radio signals to and from mobile wireless handsets, thereby facilitating wireless or "mobile" communications. Each personal wireless service facility services a geographic area immediately surrounding the facility, commonly referred to as a "cell."

40.  Each wireless service facility must be located on a cell tower of sufficient height and must be placed within a limited area within each cell so that each facility provides a line-of-sight communications signal that reaches all of the surrounding cells and can properly interact with surrounding antenna facilities to provide seamless, reliable coverage throughout a given geographic area.

41.  Every cell tower has a limited maximum coverage area, the extent of which varies depending upon several factors, including the tower height, local topography, configuration of various existing structures, customer usage, and population densities.

42.  SBA filed its SUP Application on July 1, 2024. The Application, attached hereto as **Exhibit 2**, fully complied with all relevant County Regulations.

## IV.    THE PROPOSED TOWER

43.  The Proposed Tower is a 120' multi-carrier wireless monopole within a 100' by 100' compound. **Ex 2.**

44.  After spending considerable time and resources locating a parcel of land that would meet the needs of Verizon, SBA identified the ideal location at the southwest corner assessor parcel no. 30393003. The parcel is owned by Willis Ranch, LLC. **Ex. 2**.

45.  The Proposed Tower location was chosen for two reasons.

7

46.    First, the Proposed Tower's distance from the three existing towers–the anchor six (6) miles away, the Mesa tower about four (4) miles away, and the Willis Ranch tower about four (4) miles away–makes the Proposed Tower's location optimal for closing the significant coverage gap along East Concho Highway. There is a forthcoming Verizon tower directly adjacent to the Mesa tower and Verizon will collocate on the Willis Ranch tower. However, the carriers currently using the Mesa tower and the Willis Ranch tower also lack coverage along East Concho Highway. Thus, the location is ideal for closing the coverage gap along the commercial corridor.

47.    Second, it was away from residential housing, which would limit the height of the tower to 80' and the Proposed Tower location is within the commercial corridor along East Concho highway.

48.    Moving the Proposed Tower location would require SBA to construct an additional tower to achieve its coverage goals, thereby making an alternative site not economically feasible.

## V.    SBA'S APPLICATION TO THE COMMISSION

49.    The Commission held a public hearing on the Application on August 15, 2024.

50.    Following the hearing, the Commission issued a Staff Report–attached hereto as **Exhibit 3**–which included the following relevant findings:

> a. "The proposed project meets all applicable goals within Navajo County's Comprehensive Plan."
>
> b. "Given the nature of the property and the zoning in the area, there should be minimal adverse effects on the public health, safety, and general welfare of properties in the vicinity of the proposed use."
>
> c. "The proposed use has been determined to be compatible with current and likely future uses per the Navajo County Zoning Ordinance."
>
> d. "The proposal would be an appropriate usage within the Navajo County Zoning Ordinance, if approved for a Special Use Permit."
>
> e. "Staff recommends approval of the Special Use Permit, subject to the conditions of this Staff Report." **Ex. 3 pp. 2, 4-5**.

51.   The conditions the Commission imposed related to ensuring the 120' monopole design remained the same and that SBA obtained all relevant permitting and approvals. **Ex. 3 p. 6**.

52.   The Commission sent an approval recommendation to the Board. **Ex. 3 p. 2**.

## VI.    CONSIDERATION BY THE BOARD

53.   The Board held a public hearing on the Application on September 24, 2024.

54.   At the hearing, SBA presented evidence that the Proposed Tower location was chosen because of the location of the three nearest existing towers and a forthcoming tower. The Proposed Tower location was evenly spaced from two existing towers and one tower that is planned to be built in the near future, so the Proposed Tower location would fill the coverage gap that exists east of Snowflake along East Concho Highway and its commercial corridor.

55.   The nearest home to the Proposed Tower was 2,200 feet away.

56.   The public opposition to the Application at the September 24th hearing largely came from individuals who live on property located two (2) to three (3) miles to the north of the Proposed Tower that was created for individuals with Multiple Chemical Sensitivities ("MCS") and Electromagnetic Hypersensitivity ("EHS"); due to the rural nature of the community, the mailboxes for the community− as well as other rural households− were approximately 200 feet from the Proposed Site.

57.   Despite several admonitions from the County that the County could not consider "health concerns" related to RF emissions, the opposition spoke almost exclusively of concerns regarding RF emissions and its effect on themselves, their community, and the environment.

58.   In total, eleven (11) people spoke in opposition to the Application at the September 24th hearing.

59.   Nine (9) of those eleven (11) who opposed the Application explicitly discussed the adverse effect RF emissions from the tower would have either on their health

CORE/3524207.0005/194477210.5

or on the property values in the community because the houses are designed to avoid RF emissions and the proximity of the Proposed Tower would prevent the sale of the homes to people with EHS, thereby reducing the sale price of the homes.

60.   Two (2) members of the opposition argued that based on a coverage map for Verizon that the opponents claimed to have found online, there was no significant gap in coverage.

61.   SBA explained that if the Proposed Tower was moved to appease the opposition, then either two towers would be needed or the coverage gap along East Concho Highway would not be fixed.

62.   To address concerns regarding whether a coverage gap did exist and whether the mailboxes could be moved, SBA and the Board agreed to table the Application until the November 12, 2024 Board meeting.

63.   Between July 1, 2024 (the date SBA filed the Application) and the November 12, 2024 Board meeting, the Board received a large number of letters both in support and in opposition to the Application.

64.   In support, several letters explained that they have little to no cell coverage along the East Concho Highway. The Sheriff's Department also submitted a letter in support of the Proposed Tower as it would increase coverage in a rural area.

65.   There were thirty-one (31) letters in opposition. The letters were taken from the Navajo County website and are attached hereto as **Exhibit 4**.

66.   Every opposition letter opposed the Proposed Tower based upon RF exposure and fears of what RF exposure would do to property values.

67.   Only two (2) letters expressed general concerns regarding the aesthetics of WCFs.

68.   No opposition letters discussed the adequacy of the current cellular coverage.

69.   On November 12, 2024, the Board held a second hearing to consider the Application.

CORE/3524207.0005/194477210.5

70.    At this meeting, SBA responded to each concern raised in the prior meeting.

71.    First, SBA explained that moving the mailboxes leading to the MCS/EHS community was not possible because that would require the current mail carrier contract to be extended to cover the additional territory, which is beyond SBA's control.

72.    Second, SBA provided traffic data from a traffic study conducted in August 2024 by the Arizona Department of Transportation, demonstrating that over 850 vehicles pass the Proposed Tower location each way everyday along the East Concho Highway.

73.    Third, SBA explained it had consulted several Real Estate Appraisers, including one General Appraiser from Phoenix; each consultant informed SBA that due to the unique nature of the Radio Insulated ("RI") homes, there was no reliable data for the area to demonstrate any effect the Proposed Tower would have on property value.

74.    Fourth, SBA noted that the Sheriff's Department supports the Proposed Tower.

75.    Supervisor Seymore asked if SBA informed the Sheriff's Department of the unique health concerns of the MCS/EHS community and that special building materials were used in the MCS/EHS community. SBA responded affirmatively.

76.    Fifth, SBA offered expert testimony through RF Engineer Steve Kennedy.

77.    Kennedy began by presenting several open-source-data maps of the area surrounding the Proposed Tower location which reflected diminished coverage east of Snowflake along East Concho Highway.

78.    Kennedy then used a propagation modeling tool which compares current coverage in the area with anticipated coverage in the area if the Proposed Tower is constructed and placed in operation.

79.    The propagation maps presented by Kennedy illustrated little to no current coverage east of Snowflake along East Concho Highway, and the limited current coverage in the area was only strong enough for outside reception, not indoors or in a vehicle.

80.    Kennedy then presented a propagation map that incorporated the Proposed Tower. The propagation maps incorporated not only the Proposed Tower but also the

11

existing towers which service other carriers that each are approximately four miles away. The propagation maps for the other carriers still showed little to no coverage along East Concho Highway. Because the forthcoming tower adjacent to the Mesa tower and the forthcoming collocation on the Willis Ranch tower are both the same distance from the Proposed Tower location, these forthcoming sites are indirectly incorporated into the propagation maps. The propagation map indicates that the forthcoming tower and forthcoming collocation will not fill in the coverage gap along the East Concho Highway.

81.    However, the propagation maps reflected a large increase in cell coverage east of Snowflake along East Concho Highway as a result of the construction and operation of the Proposed Tower.

82.    Kennedy further addressed opposition concerns about the online maps referenced by the opposition, explaining that those online maps all have disclaimers that real life reception does not match the depicted map. Rather, propagation modeling, Drive Testing, and Active Call Testing (the methods used by Kennedy) are far more accurate means of projecting and testing the actual coverage and reception in a given area.

83.    Kennedy also presented the Board with the results from both a Drive Test and an Active Call Test.

84.    A Drive Test measures the actual in field reception rather than the theoretical reception tested in a propagation model.

85.    The Drive Test utilized an antenna mounted to the roof of a car with multiple scanners to measure the low frequency, medium frequency, and high frequency channels along a mapped route in the area surrounding the Proposed Tower.

86.    90% of the spectrum used by the four major carriers is medium band.

87.    The Drive Test showed that the major carriers had marginal to low/no service east and north of the Snowflake for medium band coverage. The purpose for testing all major carriers was to demonstrate that even with both the forthcoming tower that Verizon plans to install adjacent to the Mesa tower which is used by other carriers and the

CORE/3524207.0005/194477210.5

collocation on the Willis Ranch tower, service along East Concho Highway would remain insufficient.

88. The Active Call Test involved the use of cell phones and scanners using the four major carriers to attempt to make and maintain calls while also measuring the in area physical cellphone identifications of attempted callers.

89. The Active Call Test found that there were insufficient WCFs to provide the capacity for the amount of bandwidth desired for all cell carriers east and north of Snowflake.

90. The Active Call Test for the four major carriers showed the throughput of data was less than one megabyte per second in the area surrounding the Proposed Tower location.

91. Sixteen (16) opponents spoke against the Application at the November 12th meeting.

92. All sixteen based their opposition on the effect RF emissions has on themselves, their community, and the environment. At least five opponents discussed a decrease in property value due to the Proposed Tower's RF emissions. Three opponents argued that the Proposed Tower would violate the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*

93. Only two opponents referenced the aesthetics of the Proposed Tower. Neither explained how a tower over two miles from their home would negatively impact their view beyond generalized aesthetic concerns regarding the aesthetics of a WCF.

94. Two opponents anecdotally explained that they believe they have good service, without presenting any backup evidence to support that conclusory allegation.

95. One opponent claiming to have good service acknowledged that he cannot make calls when driving along East Concho Highway.

96. The Board then engaged in a brief discussion.

97. Supervisor Seymore opposed the Proposed Tower claiming that the TCA

CORE/3524207.0005/194477210.5

cannot override the ADA or other miscellaneous civil rights. Supervisor Seymore also stated the Proposed Tower would place an undue burden on disabled individuals due to RF exposure. Supervisor Seymore further explained that he believed−absent any supporting evidence−that the forthcoming Mesa tower and forthcoming collocation on the Willis Ranch tower would provide sufficient coverage.

98. Supervisor Whitesinger opposed the Proposed Tower reasoning that the members of the MCS/EHS community moved there to avoid RF exposure.

99. Supervisor Benally opposed the Proposed Tower reasoning that two opponents claimed to have good coverage in the area surrounding the Proposed Tower location.

100. Supervisor Benally also expressed concerns that the Proposed Tower would violate the ADA.

101. Chairman Whiting explained that the members of the MCS/EHS community have expectations that no WCF will be installed near it. However, Chairman Whiting acknowledged that SBA met all of the qualifications necessary to obtain an SUP: "[SBA] met the qualification for those ordinance. And they have those rights."

102. The Board initially agreed to table the motion to give time to the County Attorney to find a "legal" way to deny the Application.

103. Chairman Whiting further sought to find a way to protect the MCS/EHS community from exposure to RF emissions stating, "Before it gets back to the Board, I would like to see us look at is there, is there a tool or a mechanism that allows the outcome?"

104. After a discussion regarding the TCA's 150-day "shot clock" for a determination on a WCF application, the Board decided to vote to deny the Application rather than table it because the Board was in agreement and the written statement could be issued in the days after the hearing.

105. Before taking the vote, Chairman Whiting asked what findings need to be stated so the decision would withstand litigation.

106. County Attorney Carlyon told Chairman Whiting that he needed to find: (i)

14

1 there was no substantial gap in coverage, (ii) the Proposed Tower was not the least intrusive
2 method, (iii) the Proposed Tower would harm local property values, (iv) the Proposed
3 Tower would violate the ADA and denying the Application is a reasonable accommodation,
4 and (v) health concerns were not considered in the denial.

5     107.    The Board, without any further discussion or analysis of those findings,
6 unanimously voted to deny the Application.

7 **VII.   WRITTEN DENIAL STATEMENT**

8     108.    Nearly two weeks after the November 12th hearing, the Board issued its
9 Written Statement (the "Denial Letter") as required by the TCA on November 25, 2024.
10 The Letter is attached hereto as **Exhibit 5**. Additionally, the accompanying Resolution is
11 attached as **Exhibit 6** and the accompanying Action Report is attached as **Exhibit 7**.

12     109.    The Denial Letter, for reasons unknown, was backdated to November 12,
13 2024. **Ex. 5**.

14     110.    The Denial Letter began with a disclaimer that the Board has not considered
15 any comments, statements, or materials regarding adverse health concerns or effects related
16 to RF emissions. **Ex. 5 p. 2.**

17     111.    Next, the Denial Letter provides five reasons for the denial. **Ex. 5.**

18     112.    First, public opposition claiming that the homes in the nearby MCS/EHS
19 community will lose property value. As relevant here, the letter states:

> Notably, the neighborhood in question was partially funded with
> public money, with the specific goal of creating an environment
> that minimizes radio frequency (RF) exposure, particularly for
> residents who are Electromagnetic Hypersensitive (EHS). The
> development . . . with the intent of prioritizing the health and
> well-being of individuals who are highly sensitive to
> electromagnetic fields, ensuring they could live in an area that
> minimizes RF emissions . . . . **Ex. 5 p. 2.**

24     113.    Second, public opposition to the aesthetics of the tower.

25     114.    The Denial Letter references twelve (12) other letters detailing the negative
26 aesthetics; however, to SBA's knowledge, those letters were not included in the record
27 attached to any of the public hearings, and the letters have not yet been produced to SBA

15

CORE/3524207.0005/194477210.5

in response to the Arizona Public Records Act request filed on December 4, 2024. **Ex. 5 p. 3**.

115.    The Denial Letter's explanation does not address that the Proposed Tower location is over two (2) miles away from the opposing members of the MCS/EHS community.

116.    Instead, the explanation in the Denial Letter merely recites requirements stated in Ninth Circuit case law without applying the requirement to the aesthetic concerns, "These objections are not a general opposition to wireless communications facilities but are specific to the unique circumstances of this case." *Compare*, **Ex. 5** *with*, *AT&T Wireless Serv. of Cal. LLC v. City of Carlsbad*, 308 F.Supp.2d 1148, 1161 (S.D. Cal. 2003).

117.    The Denial Letter also references the testimony from two opponents who spoke the November 12th hearing, claiming the Proposed Tower would harm the aesthetics, but omitting how the same opponents also raised concerns about RF emissions. **Ex. 5 p. 3**.

118.    Lastly, the aesthetic reasoning ends with "some property owners would have chosen not to purchase their homes had they known the tower would be located nearby." **Ex. 5 p. 3**. A number of opponents did make similar statements; however, every instance, to SBA's knowledge, was in reference to the negative health effects of RF emissions, not aesthetic concerns.

119.    Third, the Denial Letter lists public protest regarding ADA compliance as a reason for denying the Proposed Tower. **Ex. 5 p. 3**.

120.    The Denial Letter explains that SBA failed to adequately address the applicability of the ADA. **Ex. 5 p. 3**.

121.    On November 22, 2024, SBA through undersigned counsel sent a letter ("SBA Letter") to County Attorney Carlyon explaining that the Ninth Circuit has repeatedly concluded that WCFs cannot violate the ADA, and the denial of a WCF SUP application as a form of reasonable accommodation under the ADA violates the TCA's prohibition on RF emission considerations. The SBA Letter is attached hereto as **Exhibit 7**.

CORE/3524207.0005/194477210.5

122.     The Denial Letter does not address any harm to MCS/EHS disabled individuals would come by way of the Proposed Tower. It does, however, clearly imply that the RF emissions would harm the disabled individuals.

123.     Fourth, the Denial Letter states that SBA failed to establish a significant gap in coverage or that the Proposed Tower was the least intrusive means.  **Ex. 5**.

124.     The Denial Letter incorrectly claims that the forthcoming tower and forthcoming collocation were not considered in Kennedy's presentation, when in fact both were factored into Kennedy's propagation model because the forthcoming tower and forthcoming collocation are located adjacent to or on existing towers, and the propagation model demonstrated that those towers currently used by other carriers provide insufficient coverage to East Concho Highway and its commercial corridor. **Ex. 5**. Moreover, the County Regulations do not reference a significant gap in coverage as a consideration for a WCF SUP application. **Ex. 1**.

125.     The Denial Letter instead relies upon two (2) individual anecdotes that the coverage in the area is sufficient.

126.     Moreover, SBA addressed on several occasions at the public hearings why other less intrusive sites could not close the gap in coverage in an economically feasible manner.

127.     SBA is unaware of the Denial Letter's referenced probative evidence that the Proposed Tower, sitting over two miles from the nearest opponent in the MCS/EHS community, was intrusive. **Ex. 5**.

128.     These concerns were contrary to Chairman Whiting's statement at the November 12th hearing when, at the close of the Board's consideration of the Application, he stated that SBA had met all of the requirements to obtain a WCF SUP.

129.     Fifth, the Denial Letter reasoned that the Proposed Tower was inconsistent with the local area despite both the Commission's Staff Report and Chairman Whiting's position at the November 12th hearing. The Denial Letter contends that the Proposed Tower

CORE/3524207.0005/194477210.5

would change the character of the nearby neighborhood because, "The neighborhood was specifically designed to minimize exposure to electromagnetic fields (EMF), and placing a cell tower in this location would directly harm residents who chose to build their homes in this environment."

130.    Thus, the only concern regarding the Proposed Tower location's effect on the surrounding area is that the local residents may be harmed by RF emissions.

<u>**COUNT I−DENIAL BASED ON RF EMISSIONS EFFECT ON ENVIRONMENT**</u>

131.    Plaintiffs restate and incorporate by reference the preceding allegations above as if fully set forth herein.

132.    Section 332(c)(7)(B)(iv) of the TCA provides that "No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions."

133.    Considering a decrease in property value as a basis for a denial is prohibited when the projected decrease in value arises from fears of RF emissions. *City of Carlsbad*, 308 F.Supp.2d at 1159.

134.    Denying an WCF SUP application because of ADA concerns is a TCA violation. *See Wolf v. City of Millbrae*, No. 21-16649, 2023 WL 2134403 (9th Cir. Feb. 21, 2023). The Ninth Circuit reasoned that the harm caused by a WCF to an individual with EHS would necessarily be through RF emissions. *Id.* at *1-2. Because RF emissions cannot be considered when denying an SUP application, denying an SUP application as a reasonable accommodation would violate the TCA. *Id.*

135.    Of the sixty (60) public comments and letters, fifty-eight (58) specifically discuss RF emissions and its effect on themselves, their community, and the environment.

136.    All four supervisors, including Chairman Whiting, based their opposition to the

18

Application on ADA concerns and the efforts of members of the MCS/EHS community to avoid exposure to RF emissions.

137.    To attempt to avoid legal liability, the Board asked County Attorney Carlyon for advice on how to make the denial legal, and somehow, with no further discussion, adopted every single finding County Attorney Carlyon recommended.

138.    In the event that the overwhelming majority of evidence presented to a locality references RF emissions' effect on the environment, the locality bears the burden that it relied on a legitimate reason for the denial. *City of Carlsbad*, 308 F.Supp. at 1159-60; *Cellular Telephone Co. v. Town of Oyster Bay*, 166 F.3d 490, 495 (2d Cir. 1999).

139.    The Denial Letter explaining the reasons for the denial discussed RF emissions exposure, MCS/EHS individuals being harmed by the Proposed Tower, the Proposed Tower violating the ADA, and the Proposed Tower harming property value because of RF emissions. Plaintiffs take the County at its word in this regard; the County denied the Application solely based on improper RF considerations.

140.    Because the overwhelming evidence presented to the Board concerned RF emissions, the County bears the burden of demonstrating that it did not rely on RF emissions but instead relied on substantial evidence supporting another permissible reason. Substantial evidence is more than a scintilla but less than a preponderance of evidence. *Voice Stream PCS I, LLC v. City of Hillsboro*, 301 F.Supp.2d 1251, 1256 (D. Oregon 2004). Instead it is evidence sufficient to support a reasonable mind reaching the same conclusion. *Sprint PCS Assets, L.L.C. v. City of Palos Verdes Estates*, 583 F.3d 716, 726 (9th Cir. 2009).

141.    The substantial evidence inquiry depends upon state and local law, with the Court looking to the local zoning law for the substantive criteria to be applied and determining whether substantial evidence existed to support the County's decision. In other words, the County's decision to deny the Application cannot be based on arbitrary criteria; the decision to deny must be grounded in procedural and substantive requirements specifically set forth in state

19

1    and/or local law.

2        142.    The Denial Letter listed two non-RF considerations for the denial: aesthetics

3    and no substantial gap in coverage/least intrusive means.

4        143.    When the burden shifts to the locality, the locality relying on aesthetics must

5    offer more than generic concerns about WCF appearances. *GTE Mobilnet of Cal. L.P. v.*

6    *City of Berkley*, No. 20-cv-05460-DMR, 2023 WL 2648197, at *21 (N.D. Cal. March 27,

7    2023).

8        144.    While visual impact is listed in the County Regulations as a consideration,

9    none of the aesthetic concerns raised at the hearings or in the letters that the County has

10   made available to the public are anything more than a generic assertion that the Proposed

11   Tower would be an eyesore. None of the aesthetic concerns discuss how the Proposed

12   Tower would have a negative visual impact despite being located between a half-mile and

13   two miles away from the nearest opponents' homes.

14       145.    As further evidence that the aesthetic complaints were not legitimate, each

15   opponent that raised generic claims regarding aesthetics during the November 12th

16   meeting, also raised RF concerns.

17       146.    Because the aesthetic concerns were general in nature and not tailored to the

18   specific location, the record lacks substantial evidence to support the conclusion.

19       147.    The second non-RF reason is not legitimately supported by the comments of

20   two opponents that claim sufficient coverage.

21       148.    The County Regulations do not reference a "significant gap" as part of the

22   evaluation criteria and therefore applying that factor is an arbitrary standard insufficient to

23   support the denial of the Application.

24       149.    Two (2) opponents testified about RF concerns and then briefly mentioned

25   that they had sufficient coverage. One of these opponents began their public comments by

26   acknowledging that she cannot discuss RF emissions effect on health. The other one of

27   these opponents spoke immediately after her and discussed RF emissions as it relates to the

28

                                            20

local property values.

150.    It is clear both were motivated by concerns over RF emissions.

151.    This is not substantial evidence for purposes of the TCA because a reasonable mind could not weigh the self-interested testimony of two laymen over three studies conducted by Kennedy, an expert in RF Engineering.

WHEREFORE, Plaintiffs respectfully request that this honorable Court:

a.  Issue an Order prohibiting the County from denying the Application;

b.  Issue an Order requiring the County to complete the ministerial act of approving the Application;

c.  Issue a writ of mandamus directing the County to discharge its duties properly and to approve the Application; and

d.  Provide for such other and further relief as the Court deems just and proper.

## COUNT II−FAILURE TO SUPPORT DENIAL WITH SUBSTANTIAL EVIDENCE

152.    Plaintiffs restate and incorporate by reference the preceding allegations above as if fully set forth herein.

153.    The TCA provides that "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless services facilities shall be in writing and **supported by substantial evidence contained in a written record**." 42 U.S.C. § 332(c)(7)(B)(iii) (emphasis added).

154.    As stated above, the substantial evidence inquiry depends upon state and local law, with the Court looking to the local zoning law for the substantive criteria to be applied and determining whether substantial evidence existed to support the County's decision. In other words, the County's decision to deny the Application cannot be based on arbitrary criteria; the decision to deny must be grounded in procedural and substantive requirements specifically set forth in state and/or local law.

155.    The County's denial of the Application is not supported by substantial evidence contained in the written record.

21

156.     The two otherwise arguably permissible reasons for the denial in the Denial Letter are as follows:

a. **"Public Protest/Aesthetics.** The Board finds that the SUP Application has been met with significant public opposition, primarily focused on concerns regarding the aesthetic and visual impacts of the proposed wireless communications facility on nearby properties. In addition to vocal opposition expressed during the public hearing, the Board also received a Memorandum in Opposition, submitted on behalf of Safeguard Snowflake (the "Memorandum"), which includes approximately twelve (12) opposition letters detailing concerns about the visual impact of the proposed tower. The Board further finds that these concerns are raised by property owners who have personally and compellingly articulated how the proposed tower would directly and adversely affect the aesthetics and visual appeal of their properties if the SUP application is granted. These objections are not a general opposition to wireless communications facilities but are specific to the unique circumstances of this case. Testimony presented to the Board indicated that some property owners would have chosen not to purchase their homes had they known the tower would be located nearby, while one resident stated that the presence of the tower would compel them to move, as they would not tolerate seeing it from their home every day."

b. "**Lack of Hard Data - Insufficient Evidence to Establish a Need for the Proposed Tower at the Proposed Location.** The Board finds that the applicant for the SUP Application has failed to present meaningful, hard data and probative evidence to establish a need for the proposed Tower at the proposed location, as opposed to possible less intrusive viable alternative facilities or locations; that the Tower must be built to its proposed height; or otherwise that approving the SUP Application would be the only feasible means to fill a significant gap in coverage or remedy a capacity deficiency; and that there are no other potential solutions to do so. For example, although the SUP Application includes purported coverage maps, the denial of service records, drive test data, and RF data; the applicant did not provide adequate data to show a gap in coverage by failing to include projected coverage data with the approved, but not yet operational towers at the AZ3 Willis Ranch and AZ3 Concho Highway sites. Without data for the site that took these future sites in consideration, there was not sufficient evidence to indicate the need for a wireless communication facility at the AZ3 White Antelope site. The Board further finds that, based on the non-health concern related testimony and evidence presented by the public, and the lack of meaningful data and probative evidence from the applicant to the contrary, the applicant has failed to show that a denial of the SUP application would materially inhibit the provision of new or additional telecommunication services or improve existing services in the area." **Ex. 5 p. 3-4**.

CORE/3524207.0005/194477210.5

157.    The first reason, generalized aesthetic concerns, do not rise to the level of substantial evidence in support of denial. In the absence of a scintilla of actual evidence of an aesthetic injury, the County's first reason for denial is not supported by substantial evidence.

158.    Not only is there a scarcity of evidence in support of denial based on aesthetic concerns, the evidence in the record demonstrates that the tower will not have a negative effect on the aesthetics in the area.

159.    The Staff Report noted that the Proposed Tower location was in a C-R zoned area. Thus, it is a mixed use zoning district, so the addition of the Proposed Tower would not alter the character of the area. The Staff Report found that the Proposed Tower would have "minimal adverse effects on the public health, safety, and general welfare of properties in the vicinity of the proposed use." **Ex. 3**.

160.    Moreover, there are no homes within 2,200 feet of the Proposed Tower, and no opponents of the Proposed Tower live within two miles. A far cry from situations where a WCF is sought to be erected in the middle of a residential neighborhood.

161.    Similarly, the second non-RF related reason for the denial is also not supported by substantial evidence in the record.

162.    The County tries to contend that SBA failed to meet its burden in producing a satisfactory Application by failing to demonstrate the Proposed Tower would close a significant gap in coverage and was the least intrusive means of doing so.

163.    First, Chairman Whiting stated the opposite at the November 12th hearing, but just 13 days later–under the advice of counsel–changed his position on the sufficiency of the Application.

164.    Second, SBA explained on multiple occasions why the Proposed Tower location was the only plausible location to close the significant gap in coverage along East. Concho Highway. Moreover, the Proposed Tower is remarkably not intrusive. The nearest home in 2,200 feet away.

165.    Third, contrary to the Denial Letter, Kennedy did include the other towers

planned to be built in the near future in his propagation model which demonstrated that the Proposed Tower still was needed to close a significant gap in coverage.

166.    Fourth, Kennedy conducted also a Drive Test and an Active Call Test, both reflecting poor to nonexistent coverage in the area. Even one of the opponents who argued sufficient coverage existed admitted that he cannot make a phone call along East Concho Highway.

167.    To the extent that the Denial Letter states SBA failed to prove a gap in coverage despite a propagation model, a Drive Test, and an Active Call Test all accompanied by expert testimony, the County Regulations are silent as to the requirement that any tower applicant must prove that it would be closing a "significant gap" in coverage. Therefore, a denial for this reason fails the substantive evidence test as a matter of law because the requirement is arbitrary.

168.    It is unclear what standard is being applied, but it certainly is not an objective one or any standard that Navajo County has ever applied before. Therefore, it is an arbitrary criterion that lacks substantial evidentiary support.

WHEREFORE, Plaintiffs respectfully request that this honorable Court:

e.    Issue an Order prohibiting the County from denying the Application;

f.    Issue an Order requiring the County to complete the ministerial act of approving the Application;

g.    Issue a writ of mandamus directing the County to discharge its duties properly and to approve the Application; and

h.    Provide for such other and further relief as the Court deems just and proper.

## COUNT III−EFFECTIVE PROHIBITION OF COVERAGE

169.    Plaintiffs restate and incorporate by reference the preceding allegations above as if fully set forth herein.

170.    The TCA prohibits local regulation of the placement, construction, or modification of personal wireless service facilities that "prohibit[s] or ha[s] the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II).

171.    The Court reviews a zoning decision *de novo* to determine if it effectively

24

prohibits service and is not limited to consideration of evidence in the administrative record.

172.    Recent FCC guidance has clarified that a local requirement or action is an effective prohibition if it *materially inhibits* wireless deployment. "This test is met not only when filling a coverage gap but also when densifying a wireless network, introducing new services or otherwise improving service capabilities." *In the Matter of Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Inv.,* 33 F.C.C. Rcd. 9088, 9101-9104 (2018) (vacated in part on other grounds in *City of Portland v. U.S.,* 969 F.3d 1020 (9th Cir. 2020), *cert. denied sub nom. City of Portland, Oregon v. Federal Communications Commission,* 141 S.Ct. 2855 (2021)).

173.    In other words, an applicant no longer needs to provide evidence of or even suffer from a gap in service to bring a claim for effective prohibition under the TCA.

174.    The Proposed Tower is intended to provide Verizon with an economically feasible path to install a WCF and to improve cellular service and coverage for rural parts of the County and along the East Concho Highway.

175.    The Proposed Tower is the least intrusive means of providing these services. Because of the high cost of installing multiple towers that would be necessary if the Proposed Tower location was moved as the County suggests, it is not feasible for Verizon–through SBA– to install a WCF at a different location and achieve the goals set out in Paragraph 172.

176.    Significant evidence was presented to the Board that the Proposed Tower would at a minimum amplify service and coverage along East Concho Highway and northeast of Snowflake.

177.    The denial of the Application therefore has effectively prohibited the provision of personal wireless services in violation of the TCA.

178.    The County's failure to comply with the requirements of the TCA and its refusal to approve the Application has caused and will continue to cause Plaintiffs irreparable harm.

WHEREFORE, Plaintiffs respectfully request that this honorable Court:

CORE/3524207.0005/194477210.5

     i.   Issue an Order prohibiting the County from denying the Application;

     j.   Issue an Order requiring the County to complete the ministerial act of approving the Application;

     k.   Issue a writ of mandamus directing the County to discharge its duties properly and to approve the Application; and

     l.   Provide for such other and further relief as the Court deems just and proper.

## COUNT IV−DECLARATORY RELIEF PURSUANT TO THE FEDERAL DECLARATORY JUDGMENT ACT, 28 U.S.C. SECTION 2201

179.    Plaintiffs restate and incorporate by reference the preceding allegations above as if fully set forth herein.

180.    The County's denial of the Application is based upon prohibited RF-related considerations in violation of the TCA.

181.    The County's denial of the Application is not based on substantial evidence in violation of the TCA.

182.    The County's denial further has the effect of effectively prohibiting cell service in violation of the TCA.

183.    A real, immediate, actual, justifiable, and substantial continuing controversy exists between Plaintiffs and the County as to whether the County's denial of the Application violates the TCA.

184.    There is a bona fide, actual, present, and practical need for a declaration of Plaintiffs' right to an approval of its Application to construct the Proposed Tower.

185.    SBA's interest in the declaration of its rights is actual and adverse to those of the County.

186.    All conditions precedent to the relief demanded herein have been performed.

WHEREFORE, Plaintiffs respectfully requests that this honorable Court:

     m. Issue an Order prohibiting the County from denying the Application;

     n. Issue an Order requiring the County to complete the ministerial act of approving the Application;

     o. Issue a writ of mandamus directing the County to discharge its duties properly and to approve the Application; and

26

p.  Provide for such other and further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED this 12th day of December, 2024.


**STINSON LLP**


By:   /s/ *Ashley V. Cheff*

Ashley V. Cheff (AZ #036065)
1850 North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
Patrick. A. Edwards (*Pro Hac Vice*
forthcoming)
Daniel J.E. Sparacino (*Pro Hac Vice*
forthcoming)
1625 N. Waterfront Pkwy., Suite 300
Wichita, Kansas 67206-6620
*Attorneys for Plaintiffs*

CORE/3524207.0005/194477210.5